UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GABRIEL R. OPPENHEIM,

                Plaintiff,

      -v-

SAMUEL R. GOLDBERG, *et al.*,

                Defendants.

23-CV-2645 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

      Plaintiff Gabriel R. Oppenheim brings this action against Defendants Samuel R. Goldberg and Ilan Ulmer, alleging that Defendants unlawfully copied his works to create a television show, called "DCU: Deep Crime Unit" ("DCU"), about a scuba-diving law enforcement team in Japan. Oppenheim asserts copyright infringement and various state-law claims.

      Before the Court is Defendants' motion to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Court grants Defendants' motion to dismiss.

## I.    Background

### A.    Factual Background

      The following facts are drawn from the allegations in the amended complaint, which are presumed true for the purpose of resolving Defendants' motion to dismiss. (*See* ECF No. 26 ("FAC").)

      Plaintiff Oppenheim is an investigative reporter, author, and screenwriter (*id.* ¶ 4), and Defendants Goldberg and Ulmer are writers and producers (*id.* ¶¶ 6, 8). Between 2012 and 2013, Oppenheim worked as an employee of two of Goldberg's production companies. (*Id.*

¶ 16.)  In addition to drawing a salary, Oppenheim was promised payment for any of his works that ended up being produced as a television show or feature film.  (*Id.* ¶ 17.)  While Oppenheim's employment contract expired on July 31, 2013, he continued to work with Goldberg without a formal contract, as Goldberg promised Oppenheim that he would be compensated fairly.  (*Id.* ¶¶ 18-20.)

On September 30, 2013, Oppenheim emailed Goldberg with "a great TV idea," which consisted of "a cop show revolving around the divers who have to dive deep into city rivers to find dead bodies or key pieces of evidence or even to rescue the living."  (*Id.* ¶ 22.)  Oppenheim explained that the New York Police Department (NYPD) has such a dive team, and that a recent article in the New York Times mentioned a former NYPD diver, Make Carew, who could serve as a consultant for the show.  (*Id.*)  Oppenheim suggested that if Goldberg took the idea, brought in a consultant like Carew, and packaged and marketed the show, he would "have a real product."  (ECF No. 26-3 at 2.)  Goldberg emailed back, "Brilliant.  I'm on it," and over the next few weeks, Oppenheim continued to develop the concept and share his thoughts with Goldberg. (FAC ¶¶ 23-25.)  Oppenheim's original email to Goldberg about the show idea is registered with the U.S. Copyright Office.  (*Id.* ¶ 33.)

In early October 2013, Oppenheim wrote a one-page description of an episodic television show entitled "Crime Divers: NY" (the "treatment"), and he registered that treatment with the Writers Guild of America on November 5, 2013.  (*Id.* ¶ 27.)  The treatment is also registered with the U.S. Copyright Office.  (*Id.* ¶ 28.)  The treatment includes a description of the show's premise (a show following members of the NYPD Scuba Team as they tackle a new case each week), examples of the unit's missions (recovering guns and drugs, responding to bomb threats, and searching for victims and wreckage after a flight crash), and details about Carew as a

consultant for the show.  (*Id.* ¶¶ 29-30; ECF No. 26-1 at 3.)  To write the treatment, Oppenheim

had multiple conversations with Carew.  (FAC ¶ 31.)  Oppenheim also proposed other possible

show details to Goldberg, such as potential names for the show, the size and profile of the scuba

team, the types of work that the team would engage in, and the future expansion of the show to

other cities, such as Los Angeles and Miami.  (*Id.* ¶¶ 34-36.)

     In discussing the show idea in early October, Oppenheim told Goldberg that "this would

count as a project/idea I brought to your production company, which I'd sell wholesale to

you . . . but would then retain a percentage of."  (ECF No. 26-3 at 7 (capitalization altered).)

Goldberg responded, "Ya, I get it . . . The idea here would be to throw something together

quickly and have [you] own it with me.  We can discuss Friday how that would all shake out."

(*Id.*)  On March 7, 2014, Goldberg emailed Oppenheim, saying his "gut feeling says you

[Oppenheim] should split this with me," and that "this feels like your project and I feel like we

should split it."  (ECF No. 26-5 at 13.)  Oppenheim responded that he thought he was "entitled to

half your [Goldberg's] cut—so if you're giving up 5%, I deserve 47.5%," because Oppenheim

was the one who "brought [Goldberg] the idea of doing a series on these divers" and that

Goldberg had previously declined to buy the idea from Oppenheim and instead suggested that

Oppenheim "stay in for equity."  (*Id.* at 14.)  Still, "[n]egotiations between Plaintiff and

Goldberg over a written agreement for 'Crime Divers: NY' stalled in March 2014, and Plaintiff

assumed that was the end of the matter."  (FAC ¶ 44.)

     In January 2022, about eight years after negotiations ended over "Crime Divers: NY," a

show called "DCU: Deep Crime Unit" premiered in Japan on the network TBS Japan.  (*Id.* ¶ 45.)

Goldberg had shared the concept of "Crime Divers: NY" with one of his business partners,

Defendant Ulmer, and the two of them recruited a writer to author a pilot episode and other

materials to sell the show.  (*Id.* ¶¶ 46-47.)  Defendants Goldberg and Ulmer ultimately sold the show to a Canadian production company, Facet4 Media ("Facet4"), which was working with a major Israeli production company and entertainment distributor, Keshet International ("Keshet"). (*Id.* ¶¶ 48-49.)  Keshet then entered into an agreement with Tokyo Broadcasting System Television ("TBST") granting TBST the exclusive rights to produce the show, at which point Goldberg and Ulmer received additional compensation.  (*Id.* ¶¶ 51-52.)  TBST engaged a screenwriter to write a nine-episode television series, and as part of the writing process, the screenwriter interviewed Carew after an introduction by Defendants.  (*Id.* ¶¶ 53-55.)

DCU centers around a police scuba unit that consist of elite specialists who, in each episode, investigate and solve a discrete crime.  (*Id.* ¶ 71.)  It ultimately became "a huge success for TBST," as it was the "most watched Japanese television drama for all of 2022."  (*Id.* ¶ 59.) TBST also sells DVDs and Blu-Rays of the show, as well as merchandise related to the show, and Goldberg and Ulmer share in the merchandising revenue.  (*Id.* ¶¶ 60-61.)

Oppenheim first found out about the show when Goldberg sent him a link to the trailer in December 2021, a few weeks before it was scheduled to debut.  (*Id.* ¶ 57.)  Oppenheim alleges that when he confronted Goldberg about the work, Goldberg admitted:  "I should have involved you . . . I shirked on my responsibility to you.  I did something in the vein of illegality."  (*Id.* ¶ 58.)  Oppenheim is not credited in the show in any way.  (*Id.* ¶ 62.)

**B.    Procedural History**

Plaintiff Oppenheim filed a complaint on March 30, 2023 (ECF No. 3), and after Defendants Goldberg and Ulmer filed a motion to dismiss (ECF No. 20), Oppenheim filed an amended complaint on August 31, 2023 (ECF No. 26).  On October 3, 2023, Defendants filed a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (ECF No.

30.)  Plaintiff filed an opposition to the motion to dismiss on November 7, 2023 (ECF No. 37), and Defendants filed a reply in support of their motion on December 5, 2023 (ECF No. 38).

## II.      Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This means that a complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.  While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.* at 678, the Court must draw "all inferences in the light most favorable to the nonmoving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Determining whether a complaint states a plausible claim is ultimately a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## III.      Discussion

Oppenheim asserts eight counts in his complaint: one count of direct copyright infringement, three counts of secondary copyright infringement, and four counts grounded in state law.  Defendants move to dismiss the complaint in its entirety.  The Court agrees with Defendants that even upon assuming the allegations in the complaint to be true, Oppenheim has failed to state a claim and that amendment would be futile.  Accordingly, Defendants' motion to dismiss is granted with prejudice.

### A.      Copyright Infringement

To demonstrate copyright infringement, a plaintiff must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). To show the second prong of unauthorized copying, the plaintiff must "first show that his work was actually copied," and then "he must establish 'substantial similarity'" between the allegedly infringing work and protected expression in his work. *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (internal quotation marks and citation omitted).

To determine whether two works are substantially similar, courts ask whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 100 (2d Cir. 1999). Because copyright law protects only "the expression of ideas" and "not the ideas themselves," however, certain elements of works are not copyrightable. *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 67 (2d Cir. 2010). For example, "facts are not copyrightable," *Feist*, 499 U.S. at 344, nor are "'scènes à faire,' which involve 'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic,'" *Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 292 (S.D.N.Y. 2012) (quoting *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir. 1980)).

As a result, a "threshold question" in copyright infringement disputes is "what characteristics of [plaintiff's work] have gained copyright protection," as such protection "extends only to those components of a work that are original to the author." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001) (internal quotation marks and citation omitted). When a work "contain[s] both protectible and unprotectible elements," courts "must attempt to extract

the unprotectible elements from [] consideration and ask whether the *protectible elements*, *standing alone*, are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995).

Oppenheim's allegations of copyright infringement fail to state a plausible claim for relief. Much of what Oppenheim claims to be protected by copyright is not protectable, and that which is protectable is not substantially similar to the allegedly infringing work. While Oppenheim argues that the Court should not grant Defendants' motion to dismiss in part due to the early posture of the case (ECF No. 37 at 6-7), the Second Circuit has "repeatedly recognized that, in certain circumstances, it is entirely appropriate for a district court to resolve th[e] question [of substantial similarity] as a matter of law." *Gaito*, 602 F.3d at 63.

### 1.     Protectability of Oppenheim's Works

Oppenheim alleges that he has a copyright in the description of a television show as detailed in the treatment and his emails. Many of the ideas expressed in those works, however, are stock ideas that cannot be protected by copyright. Among the ideas in which Oppenheim seeks to claim copyright are the idea of a law enforcement team "working to maintain their lives and relationships on land" in New York, a show that revolves around the team's recovery of guns and clues to other crimes, and the "dark theme" of the show. (ECF No. 37 at 8-9.) But those are all standard ideas and themes related to crime shows, and "a generic theme that routinely appears throughout" a certain genre "is not entitled to copyright protection." *Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 71 (2d Cir. 2020) (explaining that in the science fiction genre, copyright cannot "protect generic themes and storylines involving aliens or advanced technology").

Accordingly, the Second Circuit has explained that a basic concept for a work, like "stories of police work in the Bronx," is not protectable. *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996) ("[E]lements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about . . . policemen in the South Bronx, and thus are unprotectible *scènes à faire*." (internal quotation marks and citation omitted)). Those principles apply here, as the concept of an elite law enforcement unit solving crime, or the idea to have a show with a certain mood or theme, is not protectable. Similarly, Oppenheim claims copyright in ideas such as the selectivity of the law enforcement team and the team's ability to travel quickly to crime scenes. But copyright protection does not extend to "'stock' themes commonly linked to a particular genre," and any show about an elite law enforcement agency could entail such elements. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) ("Foot chases and the morale problems of policemen . . . are venerable and often-recurring themes of police fiction.").[*]

While Oppenheim does include the additional idea of the scuba diving nature of the team, as well as more detailed facts about the team's admissions process, training, and work, many of those details are simply facts drawn directly from the NYPD Scuba Team's real operations. Although Oppenheim characterizes those details as original in his complaint, the emails appended to his complaint show otherwise. For example, Oppenheim emailed Goldberg a link to an article (the "Sortie Article") that he described as "the truth—tells us everything we need to

---

[*] Oppenheim also appears to suggest that his idea of utilizing Carew as a consultant is protected by copyright. (*See* ECF No. 37 at 9 & n.7.) That idea is plainly not protectable, however. The selection of Carew relates to the process for creating the expressive work, not the work itself. "It is a fundamental principle of our copyright doctrine that ideas, concepts, and processes are not protected from copying." *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50, 54 (2d Cir. 1999); *see also* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.").

know—it's amazing." (ECF No. 26-3 at 3.) Oppenheim's email then quotes extensively from

the Sortie Article, which contains many of the details that he also included in his treatment. (*See*

*id.* at 3-4.) Consider these examples:

- Oppenheim's treatment explains that "[o]nly cops with at least three years' experience may try out, which involves taking a written test and undergoing an arduous physical one." (ECF No. 3-1 at 3.) The Sortie Article explains that candidates for the NYPD Scuba Team "must have at least two years of street patrol experience," and that they must undergo "comprehensive written and medical exams." (ECF No. 32-4 at 2.)

- The treatment details how candidates must "perform pull-ups, pushups, sitting tucks, a mile run, a 500-yard swim in less than 12 minutes, a 25-yard underwater swim with a 10-pound weight belt, a 15-minute survival float and a three-minute, legs-only water-treading trial." (ECF No. 3-1 at 3). The Sortie Article similarly describes the NYPD Scuba Team's requirements as involving "12 pull-ups, 32 pushups, 75 sitting tucks, a mile run in under 6:48, a 500-yard swim in under 12 minutes, a 25 yard underwater swim wearing a 10 pound weight belt, a 15 minutes survival float and 3 minutes treading water using feet only." (ECF No. 32-4 at 2.)

- The treatment explains that "[f]ewer than 100 cops have been accepted in the last 40 years." (ECF No. 3-1 at 3.) The Sortie Article similarly recounts that "[s]ince 1968, fewer than 100 candidates have been accepted on the team." (ECF No. 32-4 at 2.)

- The treatment states that dive teams use "speedboats and helicopters at their Brooklyn base to reach any body of water in the NY area within eight minutes." (ECF No. 3-1 at 3.) The Sortie Article explains that the Brooklyn-based NYPD Scuba Team, due to a "fleet of helicopters and water craft," has "the ability to reach any body of water in the city's five boroughs . . . within ten minutes." (ECF No. 32-4 at 2-3.)

- The treatment discusses the team's various achievements, such as the recovery of "$6 million of cocaine attached to the hull of a ship." (ECF No. 3-1 at 3.) The Sortie Article quotes a Scuba Team officer's explanation that the team "recently confiscated a cache of six million dollars worth of cocaine which was being smuggled under the hull of a cargo ship." (ECF No. 32-4 at 2.)

In short, many of the details included in Oppenheim's purportedly creative works are

simply drawn from facts about how the NYPD Scuba Team actually operates. Because "facts

are not copyrightable," *Feist*, 499 U.S. at 344, those details cannot support Oppenheim's copyright infringement claim.  That is true even in spite of Oppenheim's claim that he "was the one who ***discovered*** the Sortie Article after hours of research" and "***selected*** the Sortie Article and two other articles as examples of the type of show he envisioned" (ECF No. 37 at 11), as the "first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence," *Feist*, 499 U.S. at 347.

To be sure, Oppenheim is correct that even if his works consist of only unprotectable facts and *scènes à faire*, "a compilation of unprotectable elements may enjoy copyright protection when those elements are arranged in an original manner."  *Montgomery v. Holland*, 408 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) (internal quotation marks and citation omitted).  That principle does not help Oppenheim here, however.  For starters, Oppenheim fails to explain how his selection and compilation of facts was indeed original.  He does not allege that, for example, he pulled together disparate facts describing different police units in different cities.  Rather, his compilation of facts is simply how the NYPD Scuba Team actually operates today, as evidenced by the Sortie Article's compilation of many of the same facts.  Even if Oppenheim has shown some creativity in the arrangement of facts and *scènes à faire*, though, "the quantum of originality is slight," meaning the "resulting copyright is 'thin.'"  *Beaudin v. Ben & Jerry's Homemade, Inc.*, 95 F.3d 1, 2 (2d Cir. 1996).  In that case, "infringement will be established only by very close copying because the majority of the work is unprotectable."  *Id.*  As the Court explains below, the differences between the works at issue are significant enough that any alleged copying here is far from the "close copying" that would be required to state a claim of copyright infringement.

2.      **Substantial Similarity**

Even if the Court were to assume that certain elements of Oppenheim's works were protectable by copyright, there is insufficient similarity between those works and DCU to support a copyright infringement claim.  *See Gaito*, 602 F.3d at 64 ("[I]t is entirely appropriate for the district court to consider the similarity between [the] works in connection with a motion to dismiss, because the court has before it all that is necessary in order to make such an evaluation."); *see also Castorina v. Spice Cable Networks, Inc.*, 784 F. Supp. 2d 107, 111 & n.2 (E.D.N.Y. 2011).  Here, the complaint describes the allegedly infringing series in detail (*see* FAC ¶¶ 69-73), and the complaint expressly incorporates extensive and timestamped episode-by-episode descriptions of the series provided by Defendants in their original motion to dismiss (*see id.* at ¶ 71 n.1 (citing ECF No. 21 at 5-10); *see* ECF No. 21 at 5 n.3 (referring to DVDs provided to the Court containing all nine episodes of DCU)).  In resolving the motion to dismiss, the Court relies, as Oppenheim does, on those detailed descriptions of the allegedly infringing series.  *See Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016) (permitting consideration on a motion to dismiss of "documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken" (internal quotation marks and citation omitted)).

In evaluating substantial similarity, courts "examine the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting."  *Williams*, 84 F.3d at 588.  Considered in light of those factors, the allegations fail to support a plausible inference that the works involved in this case are substantially similar.  To begin, the settings are different: Oppenheim's works involve a show titled "Crime Divers: NY" that is based in Brooklyn, while DCU takes place in Japan.  Oppenheim claims that the settings of the shows are "exactly the

same" because they are both in "a large metropolitan city on the water" (ECF No. 37 at 12), but that level of abstraction does not justify a copyright infringement claim. Oppenheim also claims that his work has a "dark" mood and theme that DCU allegedly copies, but he provides no details about what that mood or theme actually entails and how it is found in DCU. (*See* FAC ¶ 36.) Even if Oppenheim could somehow claim copyright in that "dark" mood and theme, DCU includes many other moods, such as high-action sequences and romantic storylines, as well as other themes, such as themes of leadership hierarchy and gender dynamics in the unit—none of which does Oppenheim allege to be present in his works. (*See* ECF No. 31 at 18-19.)

Moreover, while both shows are about crime-solving scuba diving units, Oppenheim's works provide very few details, and those details are not substantially similar to DCU's much more built-out materials. Oppenheim's works do not identify a single character, while DCU has a full cast of characters with their own narrative arcs. Similarly, Oppenheim's works include at most a few sentences about potential plot points, while DCU includes nine episodes that have their own storylines. Beyond being dissimilar to DCU's plot, the plot points in Oppenheim's works are far too general to support a claim of substantial similarity. For example, Oppenheim's treatment describes the scuba unit as having "swept tunnels beneath lower Manhattan when bomb threats were called in during a tour of United Nations officials" (ECF No. 3-1 at 3), which Oppenheim alleges is similar to a DCU plot in which a scuba team defuses bombs hidden by a fictional terrorist group in advance of a G20 Summit in Tokyo. (*See* FAC ¶ 71.) Beyond being drawn directly from the Sortie Article (*see* ECF No. 32-4 at 2 ("In 1995, when 50 world leaders were scheduled to meet at the United Nations, the NYPD responded to suspected bomb threats.")), the plot point of defusing a bomb threat before a major event does not support a claim of substantial similarity, as courts have "consistently found no substantial similarity" when the

similarities concern only the "broad plot idea or premise." *Nobile v. Watts*, 289 F. Supp. 3d 527, 535 (S.D.N.Y. 2017) (internal quotation marks and citation omitted); *see also Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (no substantial similarity even when "both works tell the story of a male protagonist, confined to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer . . . is attacked by the murderer, and is ultimately vindicated," as "such similarity is not, standing alone, indicative of substantial similarity"); *Castorina*, 784 F. Supp. 2d at 111-12 (dismissing copyright action based on pitch of sports-based reality show where "the treatment's vagueness . . . undercuts its protectability" and allegations fail to support substantial similarity).

Ultimately, DCU is a series that spans fifteen years and has nine episodes with significant detail about various plots and subplots.  Given the thin nature of the copyright that Oppenheim's works enjoy (if any), the level of copying must be significant to support a claim of copyright infringement.  Having reviewed the complaint's characterizations of the allegedly infringing work, the Court concludes that Oppenheim's works are not substantially similar to DCU and accordingly dismisses Count One's claim of direct copyright infringement.

Because Oppenheim's claim for direct infringement fails, the Court also dismisses Counts Two through Four, which assert claims of secondary copyright infringement.  *See Williams v. A&E Television Networks*, 122 F. Supp. 3d 157, 165 (S.D.N.Y. 2015) ("'[T]here can be no contributory infringement absent actual infringement . . .' and no vicarious infringement absent direct infringement." (quoting *Faulkner v. Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 40 (2d Cir. 2005)).

B.      **State-Law Claims**

1.      **Breach of Contract**

Oppenheim also brings a claim of breach of contract, asserting that Goldberg breached a contract he made with Oppenheim that promised to compensate Oppenheim for the television show.  Defendants first contend that Oppenheim's breach-of-contract claim is preempted by copyright law, but the Court need not resolve the preemption issue, as Oppenheim does not sufficiently allege the elements of a contract claim.  To assert a breach-of-contract claim, a plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"  *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp v. Segui*, 19 F.3d 337, 348 (2d Cir. 1996)).

The Court dismisses Oppenheim's breach-of-contract claim because the complaint does not sufficiently allege the existence of the first required element of an agreement between the parties.  For a contract to form, there must be a "'meeting of the minds' and 'a manifestation of mutual assent.'"  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288-89 (2d Cir. 2019) (quoting *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)).  That manifestation of mutual assent "must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  *Id.* at 289.

Oppenheim alleges that Goldberg "promised [him] that he would be compensated fairly" (FAC ¶ 20), that he and Goldberg "had oral and written agreements that if Goldberg ever decided to make a show using Plaintiff's works . . . that Plaintiff would be appropriately compensated" (*id.* ¶ 43), and that "Goldberg promised that Plaintiff would receive at least half of the revenue in

the event Defendant Goldberg used his connections to have a television show produced" (*id.*
¶ 126).

The complaint itself concedes, however, that "[n]egotiations between Plaintiff and Goldberg over a written agreement for "Crime Divers: NY" stalled in March 2014, and Plaintiff assumed that was the end of the matter."  (*Id.* ¶ 44.)  The complaint also does not include any allegations about the material terms of an agreement between Oppenheim and Goldberg, such as how much Oppenheim would be due—a key term of a contract to allegedly share revenue from a television show.  *See Forden v. Bristol Myers Squibb*, 63 F. App'x 14, 16 (2d Cir. 2003) (summary order) (affirming a district court's decision concluding that "no enforceable settlement had been reached" because there "had been no agreement on a material term" between the parties); *D&N Prop. Mgmt. & Dev. Corp., Inc. v. Copeland Cos.*, 127 F. Supp. 2d 456, 463 (S.D.N.Y. 2001) (concluding that no contract existed where "the parties did not reach a meeting of the minds on the essential terms of price and duration").

Instead, the emails appended to the complaint demonstrate that the parties discussed, but did not agree on, possible compensation.  Oppenheim told Goldberg in October 2013 that his idea "would count as a project/idea [he] brought to [Goldberg's] production company, which [he'd] sell wholesale . . . but would then retain a percentage of [the money.]"  (ECF No. 26-3 at 7.)  Goldberg then responded that the "idea here would be to throw something together quickly and have [Oppenheim] own it" with him, but he also stated that the two of them could "discuss Friday how that would all shake out."  (*Id.*)  And while Goldberg emailed Oppenheim in March 2014 explaining that this "feels like [Oppenheim's] project" and that the two of them "should split it" by giving Oppenheim "[s]ome sort of equity for coming up with the idea, creating initial packet, [and] finding Carew," Goldberg stated that in the context of explaining that the two of

them should "figure out [Oppenheim's] stake ASAP before [Goldberg] spend[s] any money," suggesting that no actual agreement had yet been reached and that those terms were mere suggestions.  (ECF No. 26-5 at 13.)  Moreover, even if that email did somehow contain specific terms of a contract that Oppenheim could have accepted, Oppenheim did not accept those terms. Instead, he responded by laying out his own, distinct demand—"I think I'm entitled to half your cut—so if you're giving up 5%, I deserve 47.5%" (*id.* at 14)—and nothing in the complaint's allegations suggests that Goldberg subsequently agreed to that demand.

Oppenheim therefore has not alleged that the parties reached an agreement that could give rise to a breach-of-contract claim.  At most, Oppenheim has alleged "an agreement to agree" on some form of compensation, which "is not actionable under New York law."  *Betty, Inc. v. PepsiCo, Inc.*, 283 F. Supp. 3d 154, 167 (S.D.N.Y. 2017); *see also Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) ("Stating in a conclusory manner that an agreement was breached does not sustain a claim of breach of contract.").

### 2.    Tortious Interference with Prospective Economic Advantage

Oppenheim's claim of tortious interference is preempted by the Copyright Act.  "Under § 301 of the Copyright Act, a state law claim is preempted by federal copyright law where (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act—the 'subject matter' prong—and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law—the 'general scope' prong."  *Cabell v. Sony Pictures Ent., Inc.*, 714 F. Supp. 2d 452, 461 (S.D.N.Y. 2010).

First, Oppenheim's works—a written email and the treatment—fall within the types of works protected by the Copyright Act.  Second, Oppenheim's claim that Defendants interfered

with his ability to sell or license his works to third parties such as TBST, Keshet, and Facet4 "seek[s] to redress a legal or equitable right that is equivalent to exclusive rights protected by the Copyright Act: [the] exclusive rights to publish, copy and distribute [a work] under [one's] own name." *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, 713 F. Supp. 2d 215, 221 (S.D.N.Y. 2010) (internal quotation marks and citation omitted).  Oppenheim's claim is therefore entirely derivative of his copyright rights and is preempted by federal copyright law.

Further, even if Oppenheim's tortious interference claim were not preempted, it would also fail because Oppenheim has not alleged any pre-existing relationship with a third party that would support such a claim.  To state a claim for tortious interference with business relations, a plaintiff must allege that "(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Scutti Enters., LLC v. Park Place Ent. Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) (internal quotation marks and citation omitted).  Here, Oppenheim makes no allegations about any business relations he had with TBST, Keshet, or Facet4, further justifying dismissal of the tortious interference claim.  *See Ferrarini v. Irgit*, No. 19-CV-96, 2020 WL 122987, at *8 (S.D.N.Y. Jan, 9, 2020) (dismissing a tortious interference with prospective economic advantage claim because New York law "requires that parties plead intentional interference with a pre-existing, non-speculative relationship with third parties").

### 3.      Conversion and Unjust Enrichment

Oppenheim's conversion claim is similarly preempted by the Copyright Act, as the gravamen of Oppenheim's claim is that Defendants engaged in unauthorized publication of the works.  Such a claim that the "defendants converted the . . . property of [the plaintiff] for their

own use" is "simply a restatement of [the plaintiff's] claims under the Copyright Act for unlawful copying and distribution." *New London Assocs., LLC v. Kinetic Social LLC*, 384 F. Supp. 3d 392, 411 (S.D.N.Y. 2019). The same is true of Oppenheim's claim of unjust enrichment, which also "goes to the core of a copyright infringement claim." *Gary Friedrich Enters.*, 713 F. Supp. 2d at 229; *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) ("While enrichment is not required for copyright infringement, we do not believe that it goes far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim."). Thus, because the "essence of the . . . conversion and unjust enrichment" claims is that Defendants are "exploiting rights that allegedly belong to [the plaintiff] by virtue of authorship—in other words, exploiting and thus infringing rights that are those of a copyright holder," the Court dismisses those two claims as preempted by the Copyright Act. *Archie Comic Publ'ns, Inc. v. DeCarlo*, 141 F. Supp. 2d 428, 432 (S.D.N.Y. 2001).

## C.    Leave to Amend

Oppenheim requests leave to amend, but a court need not grant such leave when it would be futile. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The allegations regarding the parties' interactions as well as the works at issue are set forth in detail in the complaint. The Court concludes that further amendment would be futile for the reasons discussed above, including (1) the dearth of protectable material in Oppenheim's works, (2) the substantial dissimilarity between the parties' works, (3) the legal insufficiency of Oppenheim's breach of contract claim, based on detailed factual allegations, and (4) the preemption of Oppenheim's remaining state-law claims. Oppenheim also already amended his complaint once after receiving

notice of the grounds of Defendants' motion to dismiss.  (*See* ECF Nos. 20, 21, 26.)  Further amendment would be futile.

**IV.     Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED and Plaintiff's request for leave to file a second amended complaint is DENIED.  The complaint is dismissed with prejudice.

The Clerk of Court is directed to terminate the motion at ECF Number 30, to enter judgment dismissing the complaint with prejudice, and to close this case.

SO ORDERED.

Dated:  May 21, 2024
       New York, New York

_____
                J. PAUL OETKEN
           United States District Judge

19